UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


VIRGINIA GAIL LARZELERE,

       Petitioner,

-vs-                                 Case No.  6:09-cv-775-Orl-31KRS

SECRETARY, DEPARTMENT
  OF CORRECTIONS, et al.,

       Respondents.

_____/

## ORDER

     This case is before the Court on Petitioner's amended petition for habeas corpus relief pursuant to 28 U.S.C. section 2254 (Doc. No. 5).  Upon consideration of the amended petition, the Court ordered Respondents to show cause why the relief sought therein should not be granted.  Thereafter, Respondents filed a response in compliance with this Court's instructions and with the *Rules Governing Section 2254 Cases in the United States District Courts* (Doc. No. 15).  Petitioner filed a reply (Doc. No. 23) to the response.

     Petitioner alleges eight claims for relief in her habeas petition:  1) the State "unconstitutionally amended" the indictment "thru [sic] jury instruction and closing argument" (claim one); 2) she received ineffective assistance of trial counsel (claims two, four, and six);  3) she received ineffective assistance of appellate counsel (claim three); 4) the prosecutor used perjured testimony (claim five); 5) "the combination of procedural and

substantive error deprived" her of a fair trial (claim seven); and 6) the preponderance of evidence did "not equate [to] a conviction" (claim eight).

## I.     *Statement of the Facts*

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

> The appellant was married to Norman Larzelere (the victim), a dentist, and she worked as the office manager for his dentistry practice.  On March 8, 1991, at approximately one o'clock in the afternoon, a masked gunman came into the victim's dental office, chased the victim, shot him with a shotgun, and fled. The victim died within a short time after being shot.  At the time of the shooting, a dental assistant, a patient, and the appellant were in the office.
>
> The appellant and her adult son, Jason Larzelere,FN1 were charged with the victim's murder.  The State's theory was that the appellant and Jason conspired to kill the victim to obtain approximately $2 million in life insurance and $1 million in assets.  Jason and the appellant were tried separately.  The appellant was tried first.
>
> FN1. Jason Larzelere was adopted by the victim after he and the appellant were married.
>
> The State presented the following evidence at the appellant's trial. Two men testified that they had affairs with the appellant during her marriage to the victim and that the appellant asked them to help her have her husband killed.  Two other witnesses, Kristen Palmieri and Steven Heidle, were given immunity and testified to a number of incriminating actions and statements made by the appellant and Jason regarding the murder. Specifically, their statements reflected that the night before the murder the appellant sent Jason to a storage unit to pick up documents, which included the victim's will and life insurance policies; that the appellant told Jason after the murder, "Don't worry, you'll get your $200,000 for taking care of business"; that the appellant told both witnesses that Jason was the gunman and that he "screwed up . . . he was supposed to be there at 12:30, but he was a half hour late, so [the dental assistant] and a patient were there. That's why I had to fake a robbery."; that the appellant directed the two witnesses to

2

dispose of a shotgun and a .45 handgun by having them encase the guns in concrete and dump them into a creek; and, that, in the days following the murder, Jason and the appellant reenacted the murder, with Jason playing the role of the gunman and the appellant playing the role of the victim. With Heidle's assistance, police recovered the guns from the creek but were unable to conclusively determine whether the shotgun was the murder weapon.

Additional testimony reflected that the appellant gave several conflicting versions of the murder to police, with differing descriptions of the gunman and the vehicle in which he left. The patient who was present at the time of the murder heard the victim call out just after he was shot, "Jason, is that you?"

It was further established that over the six-year period preceding the murder, the appellant obtained seven different life insurance policies on the victim and that within the six months preceding his death, the appellant doubled the total amount payable on his life from over $1 million to over $2 million. Although the victim assisted in obtaining these policies, it was shown that the appellant was the dominant motivator in securing the policies. In addition, evidence was introduced to show that the appellant gave false information and made false statements to obtain the policies (in securing the policies she falsely represented to several insurance agents that pre-existing policies had been cancelled, did not exist, or were being replaced by the new policy). Further, soon after the victim's death, the appellant filed a fraudulent will, which left the victim's entire estate to the appellant. The fraudulent will was prepared on the same date one of the largest insurance policies on the victim's life became effective.

In her defense, the appellant presented evidence in an attempt to show that her inconsistent versions of the murder were due to her state of mind due to the distress of having just lost her husband; that the victim assisted in obtaining all of the insurance policies; that the appellant's lovers did not think she was serious about having her husband killed; that Heidle and Palmieri were not believable and perjured themselves; and that Heidle and Palmieri were unable to obtain incriminating statements from the appellant after they had been requested to do so by police.

*Larzelere v. State,* 676 So. 2d 394, 398-99 (Fla. 1996).

## I. *Procedural History*

Petitioner and Jason Larzelere were charged by indictment with first degree murder. (Appendix A at 4.)  A jury trial was held, and Petitioner was found guilty as charged.[1] *Id.* at 436.  Following the penalty phase, the jury recommended death by a vote of seven-to-five.  *Id.* at 446. The trial judge found two factors in aggravation (cold, calculated, and premeditated and committed for financial gain) but found no statutory mitigating factors, although ceratin nonstatutory mitigating factors were found.   Finding that the two aggravating factors outweighed the relatively minor mitigating evidence, the trial judge sentenced Petitioner to death.  *Id.* at 1273-97.  Petitioner filed a direct appeal with the Supreme Court of Florida, which affirmed her conviction and sentence of death.  *See Larzelere v. State*, 676 So. 2d 394 (Fla. 1996).

Petitioner next filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 with the state trial court and later filed an amended motion for postconviction relief, raising fourteen claims in total.  (Appendix H at 389-517.)  The state trial court entered an order denying some of the claims and scheduling the remaining claims for an evidentiary hearing.  *Id.* at 667-713.[2]  Petitioner was then allowed to submit two additional claims (XV and XVI).  An evidentiary hearing was held, and the trial court entered an order denying claims IB, ID, II (paragraphs 3, 4, and 5), IIIB (new evidence of

---

[1]Following Petitioner's trial, Jason Larzelere was tried and acquitted of all charges.

[2]In particular, claims IC; IE; II paragraphs 5 (experts), 6, 7, and 8; IIIB (dual representation, limiting visitors, and preventing procurement of new counsel); IIIC; IVB (except paragraphs j, hh and xx); IVC paragraph 8 (CCP); V (incompetent mental health exam), and VI-XIII were denied.  An evidentiary hearing was scheduled as to the remaining claims.

monetary interests), IIID, IIIE, IVB (paragraphs j, hh, and xx), XIV, XV, and XVI, and

granting a new penalty phase proceeding based on claims IVC (pargraphs 7, 9, and 10) and

V (provided inadequate and false background information). *Id.* at 3343-81.

The State appealed the ruling and Petitioner cross-appealed and filed a state petition

for a writ of habeas corpus. The Supreme Court of Florida affirmed the trial court's order

denying relief relative to Petitioner's conviction, affirmed the trial court's order insofar as

it vacated her death sentence and remanded for a new sentencing proceeding before a jury,

and denied the petition for a writ of habeas corpus. *See State v. Larzelere*, 979 So. 2d 195

(Fla. 2008). The State subsequently determined that it would not seek a death sentence,

and, on August 1, 2008, the trial court sentenced Petitioner to life imprisonment with the

possibility of parole after twenty-five years. (Appendix N.)

## II.   *Legal Standards*

### A.   *Standard of Review Under the Antiterrorism Effective Death Penalty Act ("AEDPA")*

Pursuant to the AEDPA, federal habeas relief may not be granted with respect to a

claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the

holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

Even if the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable."[3] *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue

---

[3]In considering the "unreasonable application" inquiry, the Court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of law must be assessed in light of the record before the state court. *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (*per curiam*); *cf. Bell v. Cone*, 535 U.S. 685, 697 n. 4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B.     Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[4] *Id.* at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume

_____

[4]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

> effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted).  Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between."  *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

### C.      *Exhaustion and Procedural Default*

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law.  28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)      the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)      (I)      there is an absence of available State corrective process; or
>
>         (ii)      circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id*. at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The United States Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). Furthermore, the Court explained:

> [c]omity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id.*; *see also Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003) ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, where a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

## III.    *Analysis*

A.      *Claims One and Five*

Petitioner alleges in claim one that the State "unconstitutionally amended" the indictment "thru jury instruction and closing argument" and in claim five that the prosecutor used perjured testimony. In claim one, she states that the trial court improperly allowed "a conspiracy instruction," that she was never charged with a conspiracy, and that this "constructive amendment to the indictment" was improper. In claim five, she states that the State used perjured testimony from Mr. Heidle and mentions that the State acknowledged that Mr. Heidle had lied during closing arguments.

Claims one and five were raised in Petitioner's motion for postconviction relief and were found to be procedurally barred.[5] Thus, claims one and five are procedurally barred in this Court.

In the present case, Petitioner has not shown either cause or prejudice that would excuse the default. Likewise, Petitioner has neither alleged nor shown the applicability of the actually innocent exception. The entire record has been reviewed, and the Court concludes that Petitioner is unable to satisfy either of the exceptions to the procedural default bar. Therefore, claims one and five are denied.

B.      *Claims Two, Four, and Six*

Petitioner contends that she received ineffective assistance of counsel because of the following: 1) trial counsel, Jack Wilkins, was impaired during trial because he consumed large amounts of alcohol and drugs (claim two); 2) Mr. Wilkins labored under conflicts of

---

[5]Claim one was raised as claim XVI, and claim five was raised as part of claim I.

interest (claim four); and 3) Mr. Wilkins engaged in criminal activities during his representation of Petitioner (claim six). These claims were raised in Petitioner's motion for postconviction relief and were denied. The Supreme Court of Florida affirmed the denial.

    1.    *Claim Two*

Petitioner states that Mr. Wilkins was impaired during trial because he consumed large amounts of alcohol and drugs during the trial. Whether Mr. Wilkins in fact used alcohol or drugs and whether he was imparied during Petitioner's trial was far from settled in the state postconviction proceedings.

Petitioner's sister, Jeanette Lee Atkinson, testified at the evidentiary hearing that she observed Mr. Wilkins drinking in his office during trial and that Mr. Wilkins "smelled like alcohol" after coming out of a bond hearing. (Appendix H at 6027-28.) However, Ms. Atkinson did not report the matter to Petitioner. *Id*. at 6059. DorrieJean Muller, a court observer who was interested in writing a book about the case and observed the entire trial, testified that she smelled alcohol on Mr. Wilkins one time after a lunch break; however, she did not notice a decline in Mr. Wilkins' performance. *Id*. at 6075-78, 6086-87.

Patsy Antley, Petitioner's sister, testified that she went to lunch with Mr. Wilkins during the trial and that he consumed three to four drinks of straight liquor; however, she did not report his drinking to anyone. *Id*. at 6129-30, 6133-34. Gladys Jackson, who worked for Mr. Wilkins as an officer manager, bookkeeper, and receptionist, testified that Mr. Wilkins consumed alcohol in his office; that he was a social, not heavy, drinker; and that, during Petitioner's trial, he probably had a drink at the office on a Friday afternoon. *Id*. at

5582-88.

Leslie Hess, who was the second-chair prosecutor, testified that he and Dorothy Sedgwick, the lead prosecutor, noticed that, at one point during the trial, Mr. Wilkins smelled of alcohol. *Id.* at 6096. He and Ms. Sedgwick decided to watch Mr. Wilkins carefully; however, they did not notice any "substandard performance," and Mr. Hess noted that it was only on one day that he smelled alcohol. *Id.* at 6097-98. He did not bring the matter to the court's attention because he did not believe that "just smelling something" meant that there would be an effect on the trial. *Id.* at 6098-99.

Ms. Sedgwick testified that she smelled alcohol on Mr. Wilkins' breath one time after lunch during the trial. *Id.* at 6473-74. She discussed the matter with Mr. Hess, and they decided to watch Mr. Wilkins very closely. *Id.* at 6475. She did not notice any deficiencies in his performance on that or any other day during trial. *Id.* at 6509.

Dennis Harris, who had been represented by Mr. Wilkins in a state court criminal proceeding, stated in an affidavit and deposition that Mr. Wilkins told him that he was using methamphetamine during 1991 through 1992; that Mr. Wilkins also informed him that he was using cocaine during this time-frame; that Mr. Wilkins admitted using drugs before visiting him at the jail; and that he never saw Mr. Wilkins using or buying drugs. *Id.* at 3052-53, 3323, 3359-60.[6]

---

[6]Another individual, Ronald Bilberry, Jr. stated in a handwritten affidavit that he regularly supplied Mr. Wilkins with cocaine up to the time of Petitioner's trial. *Id.* at 3253-59. He also stated that he regularly provided Mr. Wilkins with methamphetamine after Petitioner's trial. However, it appears that the trial court did not allow Petitioner to supplement the record with this affidavit. *See id.* at 3321-24 (Trial Court's Order of June 15,

Kimberly Fletcher, who had a dating relationship with Mr. Wilkins at the time of the trial, testified that Mr. Wilkins was a heavy drinker but that he would never drink during a trial. *Id.* at 6491-94. John R. Howes, co-counsel representing Petitioner at trial, testified that he did not observe Mr. Wilkins drink during breaks in Petitioner's trial; that he never saw Mr. Wilkins drink more than three drinks in one sitting; and that he never saw Mr. Wilkins drink to the point that it affected him. *Id.* at 5454-5458. He never saw Mr. Wilkins consume alcohol during Petitioner's trial, and he never had any concerns about Mr. Wilkins' ability to pursue the legal issues in the case. *Id.* at 5519-5523.

Mr. Wilkins testified that, during Petitioner's representation, he occasionally had a drink in his office. *Id.* at 5696. He stated that he never drank alcohol during Petitioner's trial, although he usually had a glass of wine with dinner. *Id.* at 5825. He also never drank to the point of being hungover the next morning or where someone might smell alcohol on his breath the next morning. *Id.*

The Court notes that "[u]nder *Strickland* the fact that an attorney used drugs is not, in and of itself, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant." *Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985). Here, the prosecutors testified that, although they smelled alcohol on Mr. Wilkins on one occasion, they watched Mr. Wilkins closely and he was not intoxicated during the trial. Petitioner was unable to present any credible evidence to the contrary, and there was insufficient

---

2004).

evidence to support Petitioner's claim that her representation was deficient because Mr. Wilkins was intoxicated during the course of the trial.

Further, this claim suffers a fatal flaw: Petitioner failed to argue in any definitive way how she was prejudiced. To prevail on this claim, Petitioner must show that she was prejudiced by her attorney's conduct.  *See Strickland*, 466 U.S. at 668.  Here, Petitioner does not cite to one specific fact or instance which, as a result of counsel's errors, would have undermined the outcome of her trial.  Thus, there has been no showing that counsel acted deficiently with regard to this matter or that she sustained prejudice.  As such, the state court's rejection of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based upon an unreasonable determination of the facts in light of the evidence presented.

2.    *Claim Four*

Petitioner states that Mr. Wilkins labored under conflicts of interest based on several matters: a) there was a dual representation of Petitioner and Jason Larzelere; b) there was "dual representation of [Petitioner in] the criminal . . . and civil cases"; c) there was "misdealing with clients' monies"; d) counsel was convicted of tax evasion; e) counsel failed to hire trial experts; f) counsel abused alcohol and drugs; and g) counsel engaged in illegal activities that eventually caused him to resign from the Florida Bar.

"In order to establish an ineffective assistance of counsel claim arising from an alleged conflict of interest, a defendant 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.'" *Lightbourne v. Dugger*, 829 F.2d 1012, 1023

(11th Cir. 1987) (quoting *Oliver v. Wainwright*, 782 F.2d 1521, 1524 (11th Cir. 1986)). A potential, speculative, or hypothetical conflict is insufficient. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The mere possibility of a conflict of interest "is insufficient to impugn a criminal conviction." *Cuyler*, 446 U.S. at 350. Thus, the petitioner must show that his attorney had an actual conflict of interest and that this conflict adversely affected the attorney's performance. The Eleventh Circuit Court of Appeals in *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987), set forth the following analysis:

> We will not find an actual conflict [of interest] unless appellants can point to specific instances in the record to suggest an actual conflict or impairment of their interests . . . . Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical.

(citations omitted); *see also Cuyler* 446 U.S. at 348 (holding that the petitioner must point to specific instances in the record that "demonstrate that an actual conflict of interest adversely affected his lawyer's performance.").

a.      *Issue a*

According to Petitioner, there was a conflict of interest as a result of the dual representation of her and Jason Larzelere. At trial, Petitioner was represented by two attorneys, Mr. Wilkins and Mr. Howes; both attorneys also represented Jason Larzelere in his criminal case. The trial judge extensively advised and questioned Petitioner about the potential for conflict resulting from the dual representation, after which the trial judge made a specific finding that Petitioner knowingly and intelligently waived the right to raise

16

any apparent or possible conflicts.  (Appendix C at 635-55.)  After being fully advised by the trial court as to the potential conflict, Petitioner clearly stated that she wanted both Mr. Howes and Mr. Wilkins to represent her and that she was willing to waive any claims of conflict.

Later, in particular after the jury recommended a sentence of death, Petitioner sought to revoke the waiver and requested new counsel.  *Id.* at 6576.  The trial judge found that no conflict of interest (or other basis) existed to warrant discharge of counsel.  *Id.* at 6609-11.  Additionally, the trial court found that Petitioner's claims were meritless and that there had been no showing of ineffective or incompetent counsel that would warrant discharging counsel.  *Id.* at 6611.

Under the circumstances, the trial judge properly denied Petitioner's request to discharge counsel.  First, Petitioner did not show that she was prejudiced by the dual representation, particularly since her sentence of death was later overturned.  Moreover, the trial judge conducted a hearing on the matter and specifically found that Petitioner's claims were meritless and that counsel was competent with regard to her assertions. Finally, it is apparent that there was a valid waiver of any conflict that might have arisen out of the representation by both attorneys.  *See McCorkle v. United States*, 325 F. App'x 804, 807 (11th Cir. 2009) (a waiver is valid if the defendant was aware of the conflict of interest, realized the conflict could affect the defense, and was aware of the right to obtain other counsel).

     *b.*     *Issue b*

Petitioner states that there was "dual representation of [Petitioner in] the criminal . . . and civil cases."   Although not clearly articulated, Petitioner appears to argue that a conflict arose because Mr. Wilkins allegedly represented Petitioner's sister, Jeanette Atkinson, at the same time he was representing Petitioner.

Petitioner has not provided any evidence that Mr. Wilkins represented Ms. Atkinson during the time he represented Petitioner in her criminal case.  Ms. Atkinson testified at the evidentiary hearing that she became involved with Mr. Wilkins due to his representation of Petitioner in her criminal case; in particular, she signed the fee agreement regarding Mr. Wilkins' representation of Petitioner and physically handled matters that Petitioner could not.  (Appendix H at 6013, 6047.)  Petitioner had waived her rights to certain insurance proceeds and named Ms. Atkinson as the "next contingent person in order for [Mr. Wilkins] to take the case." (Appendix H at 6013.)  According to Ms. Atkinson, Mr. Wilkins agreed that his fees, costs, and expenses for his representation of Petitioner in her criminal case would be payable "contingent" on the insurance proceeds being paid out.  *Id.* However, Ms. Atkinson acknowledged that Mr. Wilkins received a 1991 Nissan Pathfinder and $17,000 as part of the representation agreement.[7]  *Id.* at 6014.

After Mr. Wilkins was retained to represent Petitioner, Ms. Atkinson hired attorney John Stidham's law firm to handle the insurance matter, the child custody case (involving the two youngest Larzelere children), and the probate of Dr. Larzelere's estate.  *Id.* at 6015,

---

[7]The $17,000 came from when Petitioner turned in another vehicle under the Lemon Law and received the Pathfinder.  Apparently, the difference in value between the turned-in vehicle and the Pathfinder was $17,000.  *Id.* at 6014.

6047-48, 6244-46.  Mr. Wilkins had referred Mr. Stidham to Ms. Atkinson.  *Id.* at 6247. However, Mr. Wilkins later suggested that the insurance matter be transferred to another law firm in order to get the insurance money faster and because there was a concern about the same lawyers handling all these matters at once.  *Id.* at 6015-16, 6048.  As a result, the insurance matter was transferred to attorney Kent Lilly.[8]  *Id.* at 6016.

Clearly, Mr. Wilkins' involvement with Ms. Atkinson did not amount to a representation by Mr. Wilkins of Ms. Atkinson.  Petitioner has not shown that there was a conflict of interest or that Mr. Wilkins' involvement with Ms. Atkinson adversely affected counsel's performance.

c.      Issue c

Petitioner also mentions that Mr. Wilkins was involved in financial misdealings and implies that he was under financial pressure during his representation of Petitioner. However, Ms. Jackson, Mr. Wilkins' office manager, testified that, although the office account was "running low" during Petitioner's trial, they managed to pay all of the expenses to keep the office running.  *Id.* at 5609-10.  She did not recall ever telling Mr. Wilkins that a requested action in the case could not be done because of insufficient funds.[9] *Id.* at 5619.

Petitioner has not demonstrated that Mr. Wilkins was under any financial pressure

---

[8]Only the insurance matter went to Mr. Lilly.  *Id.* at 6048-49.

[9]Ms. Jackson did state that, aside from a "small advance" from Mr. Stidham, who was handling the insurance matter, and a 1991 Pathfinder, no money was received for Petitioner's case.  *Id.* at 5606-07.

during the time of her trial or that Mr. Wilkins was involved in any financial misdealings with regard to her case.  As a result, there has been no showing of a conflict of interest with regard to this matter.

### d.      Issue d

Petitioner vaguely asserts that the "tax evasion" charges against Mr. Wilkins created a conflict of interest.  However, Mr. Wilkins testified at the evidentiary hearing that he was not aware of the federal investigation at the time he represented Petitioner.  *Id*. at 5876-77. Petitioner has not provided any evidence supporting her assertion that any tax evasion charges pending against Mr. Wilkins created a conflict of interest.

### e.      Issue e

Petitioner next states that counsel failed to hire experts.  This issue is without merit. Petitioner has not shown that the failure to hire expert witnesses was due to financial conflicts or was the result of a conflict of interest.  Ms. Jackson testified that, although money may have been low, the operating expenses were always met.  Mr. Wilkins testified that he did not seek indigency status for costs and expenses because his employment contract for taking Petitioner's case contained payment provisions for those types of costs and expenses.  *Id*. at 5797-99.  Moreover, assuming he had wanted to hire any experts, Mr. Wilkins stated that he would have petitioned the trial court to pay the expert fees.  *Id*. at 5802.  Further, Mr. Wilkins testified to his reasons for not hiring experts, namely that he did not believe it would have assisted the defense of "a foiled robbery attempt."  *Id*. at 5814-17.

In particular, he stated "[t]here were no areas that I felt needed an expert witness." *Id*. at 5773. This was reasonable trial strategy, and Petitioner has not shown that the failure to hire experts adversely affected her case.

Petitioner also has not proven that Mr. Wilkins failed to hire experts because of a financial conflict resulting from the fee arrangement and his personal financial problems or that Mr. Wilkins had an interest in not hiring experts based on financial concerns. Consequently, there has been no showing of a conflict of interest with regard to this issue.

f.      *Issue f*

Petitioner stated that a conflict of interest occurred because of his abuse of alcohol and drugs. Mr. Wilkins' use of alcohol and drugs was discussed previously, and there has been no showing of a conflict of interest with regard to this issue.

g.      *Issue g*

Petitioner mentions that Mr. Wilkins was engaged in illegal activities that eventually caused him to resign from the Florida Bar. However, Petitioner has not demonstrated that Mr. Wilkins' involvement in "illegal activities" during the time of her trial (including his eventual disbarment and prosecution for tax evasion) created an actual conflict of interest.[10] Aside from conjecture, Petitioner presents no evidence that these illegal activities created a conflict of interest in her case.

---

[10]Mr. Wilkins testified that he was convicted of twelve counts of money laundering, one count of obstruction of justice, one count of income tax evasion, and two counts of perjury. *Id*. at 5817. Petitioner also presented evidence that Mr. Wilkins was asked by the Florida Bar to respond to a complaint during Petitioner's trial, *id*. at 6174-75, 6183-85, and that Mr. Wilkins subsequently resigned from the Florida Bar. *Id*. at 6187.

The Court further finds that, with regard to all of these issues, Petitioner has not pointed to specific instances in the record that demonstrate that an actual conflict of interest adversely affected her lawyer's performance.  As such, the state court's rejection of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based upon an unreasonable determination of the facts in light of the evidence presented.

3.      *Claim Six*

Petitioner states that Mr. Wilkins engaged in criminal activities during his representation of her.

The Court discussed this claim in part with regard to claim four.  As discussed, Mr. Wilkins testified that he was unaware of the federal investigation at the time of Petitioner's trial, and Ms. Jackson testified that the office's ongoing operating expenses were always covered.  Ms. Jackson also testified that there was no impropriety with any financial matters relating to Petitioner's case.  *Id.* at 5615.  The evidence showed that Mr. Wilkins had no knowledge of the federal charges, that his office operating expenses were being met during his representation of Petitioner, and that there was no indication of any financial pressure on Mr. Wilkins or that he engaged in any financial misdealing with regard to Petitioner's case.  Thus, Petitioner has not shown that counsel acted deficiently with regard to this matter or that she sustained prejudice.  Consequently, the state court's rejection of this claim was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based upon an unreasonable

determination of the facts in light of the evidence presented.

## C.    Claim Three

Petitioner alleges that she received ineffective assistance of appellate counsel because counsel failed to argue on direct appeal that the State unconstitutionally amended the charge in the indictment through jury instructions and closing argument.  This claim was raised in Petitioner's petition for writ of habeas corpus, which was denied.

It is well established that a defendant has the right to effective counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984).  The standard for analyzing ineffective assistance claims is the same for trial and appellate counsel.  *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987).  The Eleventh Circuit has applied the Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims.  *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).

According to Petitioner, the trial court's reading of a conspiracy instruction and the State's closing argument referencing the instruction impermissibly expanded the grounds on which she could be convicted from the charges set forth in the indictment.  The trial judge gave the conspiracy instruction because the standard principal-by-hire instruction used the term co-conspirator: "Now, over at the principal instruction, I have done some research on this, and I'm concerned that we're using the term co-conspirator in that instruction, and yet but for the instruction that was earlier given, included the definition of conspiracy, there is no definition as it relates to this instruction of the elements of conspiracy."  (Appendix C at 5771.)  The instruction provided, in part, as follows:

23

If the defendant paid or promised to pay another person or persons to commit a crime, the defendant must be treated as if she had done all of the things the person who received or was promised the payment did if, one, the defendant knew what was going to happen, two, she made or promised the payment in exchange for the commission, or promised to the [sic] commit the crime or to help commit the crime, and three, the crime was committed by a co-conspirator.

To be a principal, the defendant does not have to be present when the crime is committed.

In considering the application of this above described instruction on principals to this case, the elements of the limited definition of criminal conspiracy that you must determine have been proven beyond a reasonable doubt are that, one, the intent of the defendant and of the co-conspirator, was that the offense that was the object of the conspiracy, to wit, first degree murder, would be committed, and two, in order to carry out the intent, the defendant and the co-conspirator agreed, conspired, combined, or confederated to cause said offense to be committed, either by them or one of them, or by some other co-conspirator.

It is not necessary that the agreement, conspiracy, combination, or confederation to commit that offense be expressed in any particular words, nor that words passed between the defendant and co-conspirator.

It would not be necessary that the defendant do any act in the furtherance of the offense conspired.

It is a defense to a charge of criminal conspiracy that a defendant, after conspiring with one or more persons to commit the offense that was the object of the alleged conspiracy, persuaded the alleged co-conspirators not to do so, or otherwise prevented commission of the offense that was the object of the conspiracy.

*Id*. at 5897-98.

The indictment charged both Petitioner and Jason Larzelere with the murder of

Norman Larzelere.  (Appendix A at 4.)  Under Florida law,

a person is a principal in the first degree whether he actually commits the

> crime or merely aids, abets or procures its commission, and it is immaterial whether the indictment or information alleges that the defendant committed the crime or was merely aiding or abetting in its commission, so long as the proof establishes that he was guilty of one of the acts denounced by the statute.

*State v. Roby*, 246 So. 2d 566, 571 (Fla. 1971). Further, "[i]n order to be guilty as a principal for a crime physically committed by another, one must intend that the crime be committed and do some act to assist the other person in actually committing the crime." *Staten v. State,* 519 So. 2d 622, 624 (Fla. 1988). In addition, "[i]n order to convict the aider-abettor it is not necessary to show that the principal perpetrator was convicted of the same crime, nor is it even necessary to show that he was convicted at all." *Potts v. State*, 430 So. 2d 900, 902 (Fla. 1982).

In the present case, Petitioner could have been convicted as charged based on the State proving beyond a reasonable doubt that she intended that Dr. Larzelere be murdered and that she did some act to assist the person who actually killed him. Consequently, the jury instructions were proper and correctly presented the charges against Petitioner to the jury. The instructions were not a constructive amendment to, or fatal variance from, the indictment. As a result, appellate counsel was not ineffective for failing to argue this claim on direct appeal. As noted by the Supreme Court of Florida, "[t]his Court would not have found any error in the trial court's instructions or the State's closing argument had the claim been raised on appeal." *Larzelere*, 979 So. 2d at 216.

The Court also notes that Petitioner's appellate counsel submitted an initial brief which was comprehensive, thorough, and well-argued. The Court finds that appellate

counsel's decision not to pursue this other claim  was consistent with reasonable appellate strategy that, under the deferential standard of review articulated in *Strickland*, should not be second-guessed.

Under the circumstances, it cannot be said that the state court's denial of this claim was contrary to, or involved an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence.  As a result, Petitioner is not entitled to federal habeas relief on this claim.

**D.   *Claim Seven***

Petitioner argues that "the combination of procedural and substantive errors deprived" her of a fair trial.  This claim was raised in Petitioner's state habeas petition and was denied.

Because Petitioner has failed to establish that the violations she alleges were indeed errors, they cannot support a cumulative error claim.  *See United States v. Murray*, 154 Fed. App'x. 740 (11th Cir. 2005).  Arguments that are inadequate individually are no more adequate collectively.  Thus, it cannot be said that the denial of this claim by the Florida courts was contrary to any Supreme Court decision so as to warrant relief under the AEDPA.

**E.   *Claim Eight***

Petitioner asserts that the preponderance of evidence did "not equate [to] a conviction."  It does  not appear that this claim was raised in the state courts.  As such, it should be denied as procedurally barred since Petitioner has not demonstrated the

applicability of the exceptions to the procedural bar.

However, in an abundance of caution, the Court will address the merits of this claim. The standard of review in a federal habeas corpus proceeding when the claim is that the petitioner has been convicted on insufficient evidence was articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979), and described as follows:

> [W]hether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Id.* at 319. Although the facts as they exist in the record may support opposing inferences, a federal habeas court must presume that the jury resolved such conflicts in favor of the prosecution and against the defendant. *See Heath v. Jones*, 863 F.2d 815, 820 (11th Cir. 1989).

Here, looking at all the evidence in a light most favorable to the State and with every reasonable inference construed in favor of the verdict, there is ample evidence to support Petitioner's conviction. Steven Heidle and Kristen Palmieri were given immunity and testified to numerous incriminating actions and statements made by Petitioner and Jason Larzelere. For example, on the morning of the murder, at the request of Petitioner, Mr. Heidle and Jason Larzelere retrieved documents, including the victim's will and life insurance policies, from a storage unit. (Appendix C at 1757-61, 3046-53.) After the murder, Petitioner told Jason Larzelere that "he would receive his $200,000 for taking care of business as soon as the insurance money came in." *Id.* at 1770, 3151. In addition,

Petitioner told both witnesses that Jason Larzelere was the gunman and that, because he (Jason Larzelere) was late to the scene, Petitioner had to "fake the robbery." *Id*. at 1772-73, 3187, 4280. Petitioner told Ms. Palmieri that a patient at the office during the murder heard the victim screaming "Jason," and Petitioner herself heard the victim call Jason's name. *Id*. at 4281. After the murder, Jason Larzelere and Petitioner reenacted the murder, with Jason Larzelere acting as the gunman and Petitioner playing the role of the victim. *Id*. at 4281-82. Further, Petitioner directed Mr. Heidle and Ms. Palmieri to dispose of a shotgun and a .45 handgun by encasing the weapons in concrete and dumping them in a creek. *Id*. at 3165-84, 4183-95.

Norman Lee Karn, who had an affair with Petitioner during her marriage with the victim, testified that Petitioner specifically mentioned that she wanted "[h]er husband to be killed." *Id*. at 2041. Ronnie Lee Hayden also heard Petitioner mention that she wanted her husband murdered. *Id*. at 2072-75. Philip Langston, who also had an affair with Petitioner during her marriage with the victim, testified that Petitioner told him that "she had to get rid of" her husband, that she "had to have [her husband] killed," that she was willing to pay fifty thousand dollars to do so, and that she asked him if knew anyone who could do that. *Id*. at 2096-97

Emma Lombardo, Petitioner's dental assistant, was in the dental office at the time of the shooting and heard Petitioner, who was also in the office, scream immediately after the shooting: "Jason? Is that you, Jason?" *Id*. at 2420-21. Hilda Levezinho, a patient of the victim, was in the dental office at the time of the shooting and, after the shooting, heard the

victim state, "Where are you Jason?"  *Id*. at 2145.  The victim mentioned that name "a couple of times."  *Id*.  David Gamell, an investigator with the Edgewater Police Department, stated that Petitioner told him that she had shouted out "Jason" after the shooting.  *Id*. at 4677-83.    It was further established at trial that Petitioner had obtained several different life insurance policies on the victim and that she had provided false information to obtain the policies.  *Id*. at 2769-80.  Moreover, Petitioner filed a fraudulent will, which left the victim's entire estate to Petitioner.  *Id*. at 3894-3904, 3907-08, 3950-75.

In light of the evidence presented at trial, the Court concludes that the evidence, when viewed in a light most favorable to the State and after resolving all conflicts in favor of the prosecution, mandates the denial of Petitioner's claim.  *See Machin v. Wainwright,* 758 F.2d 1431, 1435 (11th Cir. 1991) (the federal habeas court must presume that conflicting inferences to be drawn from the evidence were resolved by the trier of fact in favor of the prosecution).  The Court determines that a rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt.  Merely because the evidence provides some support to Petitioner's theory does not warrant the granting of habeas corpus relief.  *See Wilcox v. Ford*, 813 F.2d 1140, 1143-44 (11th Cir. 1987); *Martin v. State of Alabama*, 730 F.2d 721, 724 (11th Cir. 1984) ("[t]he simple fact that the evidence gives some support to the defendant does not demand acquittal.").

Accordingly, this Court concludes that the evidence, when viewed in a light most favorable to the State, and resolving all conflicts in favor of the prosecution, mandates the denial of this claim.  *See Shaw v. Boney*, 695 F.2d 528, 531 n.6 (11th Cir. 1983).  Under the

*Jackson* standard, there was sufficient evidence to support the jury's verdict, and this claim is denied.[11]

Any of Petitioner's allegations not specifically addressed herein have been found to be without merit.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      The Amended Petition for Writ of Habeas Corpus (Doc. No. 5) filed by Virginia Gail Larzelere is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

3.      This Court should grant an application for certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner has failed to make a substantial showing of the denial of a

---

[11]Further, Petitioner has failed to demonstrate that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Likewise, Petitioner has not shown that the adjudication of the claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

constitutional right.[12]  Accordingly, a Certificate of Appealability is **DENIED** in this case.

       **DONE AND ORDERED** in Chambers in Orlando, Florida, this 18th day of August, 2011.

                                    GREGORY A. PRESNELL
                                   UNITED STATES DISTRICT JUDGE

Copies to:
OrlP-2 8/18
Counsel of Record
Virginia Gail Larzelere

---

[12]Pursuant to Rule 11 of the *Rules Governing Section 2254 Cases In the United States District Courts*,

> The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue.  If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).  If the court denies a certificate, a party may not appeal the denial but may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.  A motion to reconsider a denial does not extend the time to appeal.